# CHARLESTON.

MAGGIE WHITE v. OHIO VALLEY ELECTRIC RAILWAY CO.

(No. 5226.)

Submitted February 17, 1925.   Decided March 3, 1925.

CARRIERS—*Person Carried Beyond Destination by Interurban Car and Injured While Walking Home Along Tracks Held Not Negligent.*

Plaintiff, a woman of 52 years of age, and her married daughter boarded defendant's interurban car and were carried a mile beyond their destination into a suburban and sparsely settled part of the city. They were directed to alight and wait for the next car back due to arrive in fifteen minutes. They were strangers at that point, and it was a cold, dark and stormy night, the time being about 8:45 or 9 o'clock P. M. They waited "a long time," and being chilled and frightened, attempted to reach their home one-half mile distant by walking back between the interurban tracks, and in doing so suddenly fell a distance of about ten feet into a stream, at a trestle which spanned it, plaintiff receiving severe injuries. A car from the direction in which she was walking picked her up and carried her back beyond where she alighted and she was transferred to the car for which she was directed to wait, and was taken home. Roads, safe and convenient for pedestrians, ran parallel to the tracks about a block away on either side, but of these roads she was not aware.

*Held:* The facts and circumstances do not warrant a conclusion by the appellate court that plaintiff was guilty of contributory negligence preventing a recovery for her injuries.

(Carriers, 10 C. J. §1266.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Cabell County.

Action by Maggie White against the Ohio Valley Electric Railway Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Vinson, Thompson, Meek & Renshaw,* for plaintiff in error.
*John T. Graham* and *Thomas West,* for defendant in error.

LIVELY, PRESIDENT:

This action is for personal injuries to plaintiff, Maggie White, against defendant, Ohio Valley Electric Railway Company, sustained by her in falling through a trestle or small bridge erected by defendant over Krauts Creek, a small stream in the corporate limits of the City of Huntington, while endeavoring to return to her home at night after having been carried by defendant beyond her destination on its interurban railway. The jury found for plaintiff in the sum of $1,500.00 and judgment was entered on the verdict. Defendant prosecutes error.

The facts:

Plaintiff, 52 years of age, accompanied by her daughter, Mrs. Cooper, who had not travelled over defendant's road very much, boarded an interurban car in the City of Huntington at 10th Street about 8:15 or 8:30 P. M., April 1, 1924, to go to her home in Circle 5 of Westmoreland, a suburban part of the city. She worked in a hospital, attending to the nurses' rooms and perhaps performed duties of a similar nature at an apartment house, and usually rode the interurban cars in reaching her home after work. She had done so for about a year previous to this occasion. Fares were collected by defendant according to zones. That is, one fare of six cents took a passenger to the limit of the first zone, and if he travelled beyond that limit he was required to pay another six cents, and so on for each zone travelled. Plaintiff paid fare for one zone, the limit of which was at a stop named "Driver" and where she always got off, walked thence about one-half mile to her home farther down the track and one block therefrom on Auburn Road, a cinder road, which ran practically parallel to the track for several miles. Before the end of the zone was reached and two stops therefrom, the conductor called for fares from those travelling beyond Driver, and if any of them did not go beyond that stop, either intending to get off there or at any of the intermediate stops before reaching Driver, they would answer "Driver" or "I get off" and no additional fare was collected. Some times, under this system, passen-

gers travelled beyond a zone limit without paying the additional fare unless the conductor discovered them in the imposition. When Chapman stop (two stops east of Driver) was reached, the conductor collected fares for the second zone and requested such fare from plaintiff and her daughter, and they, or one of them, replied "Driver," as was the custom, and the conductor passed on. Four Pole was the next stop, and the next stop after this was Driver, where plaintiff intended to and should have alighted; the next stop a block farther was Westmoreland; the next, two or three blocks farther, was Vinson and the next was East Road which was nearly opposite plaintiff's residence, a block or so away from the car line. Then came Kellogg stop and some distance beyond was Handley, where plaintiff alighted. The distance between Driver and Handley was about one mile; so it will be seen that plaintiff went a mile beyond her destination and passed five stops at various points in that mile. The night was cold and dark. It was raining and snowing; and a severe wind was blowing. The car was electrically lighted and was equipped with the usual push buttons near each seat, which buttons when pushed rang a bell at the front and rear, apprising the motorman and conductor that a passenger wanted to get off at the next stop. The car was crowded and some of the passengers were standing in the aisle. Plaintiff and her daughter were seated. They remained seated until they thought they had about reached Driver, and then went to the motorman and inquired of him if they hadn't reached Driver. He replied: "Lady, you are a mile below Driver." Plaintiff then asked the motorman what she should do and was told by him to get off and wait for the car going up. They were then approaching Handley where the car stopped, and they got off. It is difficult to say whether the car stopped at Driver. Plaintiff and her daughter said it did not, or if it did they could not recognize the stop on account of the darkness. The conductor was under the impression his car stopped at Driver because they scarcely ever got by without stopping. Two passengers said the car stopped to the best of their recollection; but were not positive. The motorman did not remember. Plaintiff did not signal the car to stop, because

she did not know when to do so on account of the darkness and speed of the car. She said she relied on the stop being called out by the conductor as was the usual custom at night, and although she listened attentively, she did not hear any stop called. No one says the stops were called, and we cannot say that defendant was not negligent in carrying her by her destination, nor that she was guilty of contributory negligence in not signalling for a stop when the car approached her destination. There being a controversy as to whether the car stopped at Driver, based largely on impressions that it did or did not stop; and no controversy over the fact that the station was not called as was the custom, the finding of fact was peculiarly within the province of the jury. It found upon an interrogatory propounded by defendant that the car did not stop at Driver. It appears that these stops were not lighted. Small, covered, boarded structures were erected at these stops, the open part facing the track and enclosed at both sides and the back, where waiting passengers might find a kind of shelter. They were neither lighted nor heated. Such a structure was at Handley, but plaintiff and her daughter say they did not see it in the intense darkness. After waiting a "long time", for a returning car and being chilled by reason of exposure to the weather and rain, and being excited and not knowing where they were, they concluded to walk back up the track toward home, and in so doing, while using the space between the west and east bound tracks, they suddenly walked into the trestle or bridge over Krauts Creek and fell a distance of about ten feet, and plaintiff was injured in her back, her ankle was thrown out of place and a ligament was torn loose in her foot or ankle. Her daughter got her out of the water and onto the track. A westbound car was stopped by the daughter, and the plaintiff was taken on board and carried back beyond Handley and was transferred to a car coming back in the direction of her home. She was carried to her home or to some place nearby and the next morning she was sent to the hospital, where she stayed two days and was sent home. No point is raised on the amount of the verdict. The motorman confirms plaintiff and her daughter in their statement that she

inquired of him if they were not about Driver stop and that he replied to her, "My good lady, you are a mile below Driver," He says they got off voluntarily at Handley and that he told them to wait for the next car. There was a paved road running parallel to the street car line about a block to the south extending from beyond Handley to Huntington and passing plaintiff's house about two blocks to the south. The B. & O. Ry. tracks ran between this paved road and the car line. On the north of the car line and a block away, Auburn road, a cinder road and in good condition, ran from below Handley nearly parallel with the car line right by plaintiff's house (her lot abutted on it). Abutting on the right of way of the car line, and on its south another street or road in rather indifferent condition but easily passable by pedestrians, extended from Handley to East Road stop, which was a block away from plaintiff's house. Handley road connected Handley stop with Piedmont road a short block to the south; and cross roads ran across the tracks at Kellogg Stop and at East Road stop, connecting the three roads above named. So, it will be seen that plaintiff could have taken any of these cross streets and traversed any of these roads which ran near her home, one of which, Auburn road, ran by her door. Her reason for not doing so was that she did not know these roads were there or where they led. She had never been below her home (except on the cars), and the night was too dark to see. Lights were along the Piedmont road at various points. There were several dwelling houses at Handley and there were about twenty-two dwellings between Handley and Kellogg stop; there were also a number of dwellings in the vicinity of East Road stop. Plaintiff could have made inquiry at these houses. Her reason for not doing so was that they were all dark, no lights showing in them, it was getting very late and she hurried on. No street car passed going in either direction while they were walking the track, nor does it appear when the eastbound car arrived at Handley. The car for which she had been directed to wait, was the car to which she was transferred and brought back after her injury. Usually the cars ran in both directions at intervals of fifteen minutes, of which fact plaintiff was aware. She said she had never been at

Krauts bridge except to ride over it in the car. These are the facts, stated at more than usual length, for it is apparent that the case turns upon the question of contributory negligence on plaintiff's part in attempting to reach her home by walking on the tracks, and by not waiting for the up car as directed.

Was plaintiff guilty of contributory negligence? Was the negligence of defendant in carrying plaintiff beyond her destination the proximate cause of her injury and consequent damage? These are the controlling questions and their correct answer decide the case. They are not without difficulty. The contentions, of course, are in sharp conflict. There is no appreciable conflict of evidence. It is true that the motorman says he did not advise them to alight at Handley; that they said something about walking back when they left the car and he told them not to walk, but to wait for the next car. This detail they both deny; but they and the motorman agree that he told them to wait for the next car going back. Defendant complains of the court's instruction to the effect that if they believed plaintiff was directed by the motorman to wait at Handley and take the eastbound car, and she could have so waited and not been hurt; that she knew an eastbound car would be along in a short time, that she waited a while and then elected to walk back and was hurt by the fall, then she could not recover, unless the jury believed from the evidence, facts and circumstances that she acted with prudence and in such manner and with such regard for her own safety as an ordinarily prudent and careful person would have acted under such circumstances, and if they believed she acted with prudence and due regard for her own safety under all the circumstances, then she could recover, otherwise she could not recover for her injuries. The error claimed is that there was no conflict in the testimony regarding the instruction by the motorman to wait for the eastbound car and no conflict on the fact that she knew an eastbound car was due to come by in a short time; and that the facts being undisputed it was error to submit to the jury the question of her contributory negligence, that being a question solely for the court where no conflict of fact

98 W. Va.

arises. Every element of this instruction was submitted to the jury by special interrogatories propounded by defendant. By these interrogatories they were asked to answer: First. If they believed the car stopped at Driver, and the answer was, no. Second. Was Handley a safe place for her to remain until the eastbound car came, and the answer was, no. Third. Did the motorman advise or instruct her to wait for the eastbound car when she got off, and the jury answered: "Yes, get off and wait." Fourth. Was she guilty of negligence contributing to her accident by failing to heed the motorman's advice and undertaking to walk through the rain and darkness on the track, and the answer was, no. And, Fifth. Was she guilty of negligence contributing to her accident in walking the track and not using the streets, and the answer was, no. If the jury has given response to these interrogatories, justifiable under the undisputed testimony, then no injury is done by the instruction which submits practically the same in substance to them, together with the question of the reasonableness of her acts under the circumstances from the standpoint of prudence and safety. "Where the evidence is not contradictory, proximate cause is a question of law to be determined by the court, and not a question of fact to be determined by the jury." *Schwartz* v. *Shull,* 45 W. Va. 405. So, the responses to the interrogatories and the finding under the instructions if not consonant with the law under the undisputed facts cannot stand. As above stated, whether defendant was negligent in carrying plaintiff beyond her destination was dependent on a controverted fact, and on whether the usual custom of calling the stops at night had been followed, and whether plaintiff had a right to rely in part on that custom. This question was properly submitted to the jury. So we return to the controlling question presented by the uncontradicted evidence and placed squarely before the trial court by defendant's motion to give a peremptory instruction to find in its favor; and its motion to set aside the verdict as contrary to the law and evidence.

The law:

The question we have to deal with is whether there is a proximate relation between the damages to plaintiff by rea-

son of her walking into the trestle and the negligent act of defendant in carrying her by her destination and directing her to alight at Handley. It is vitally important that there be a direct causal connection between the injury to plaintiff and the damage she suffered by the fall. If the damage be connected with the negligence of defendant by an unbroken chain of events so that it may be said that the damage was a natural consequence of the act of defendant, having regard for the usual course of nature and of cause and effect in a line of unbroken causation, then the damage is held to be proximately caused by defendant's negligence, and naturally and logically flows therefrom. It is not necessary that an *immediate* causal connection between the negligence and the damage be shown. Generally a wrong-doer is liable for all the direct injury resulting from his act although the resultant injury could not have been contemplated as a probable result. Sedg. Meas. Dam. 130, note; *Hill* v. *Winsor*, 118 Mass. 251; *Keenan* v. *Cavanaugh*, 44 Vt. 268. The rule for breach of a contract is different, and is limited to such damages as may have been reasonably contemplated by the parties at the time the contract was made. But in actions for tort the rule is as above stated. Sutherland Damages, Vol. 1, Sec. 16; *N. & W. Railway Co.* v. *Spears*, 110 Va. 110; *Ohio-West Va. Co.* v. *Ry. Co.*, 97 W. Va. 61, 124 S. E. 587. Counsel for plaintiff rely upon the case of *Brown* v. *Chicago &c. Ry. Co.*, 54 Wis. 342, 41 Am. Repts. and kindred cases. In the Brown case, just cited, a pregnant woman passenger was carelessly directed by the brakeman to leave the train three miles short of of her destination on a cloudy night. She was a stranger at that point and could not see the station because of a long freight train, and proceeded to walk to her destination, which action resulted in sickness and miscarriage. The negligent act of the railway company was held to be the proximate cause of the injury. But defendant's counsel argue that even if defendant was negligent in carrying plaintiff beyond her stop and in causing her to alight at Handley, her conduct in disregarding the advice of the motorman to await an eastbound car, and in walking the track instead of the roads nearby, broke the chain of causation commencing with de-

fendant's negligent act so that it did not reach to her fall and injury. In short, that her imprudent acts after getting off the car were the proximate cause of her injury and prevent recovery under the contributory negligence doctrine. *Young v. C. G. & W. Ry. Co.*, 37 Alt. 1013; *Carter v. So. Ry. Co.*, 55 S. E. 771; *Fowlks v. So. Ry. Co.*, 32 S. E. 464; *Lewis v. F. & P. &c. Ry. Co.*, 52 Am. Rep. 790, and similar cases are cited. In the *Young* case the passenger had been carried beyond his stop and was directed to walk back on the track. Being a stranger he did so, and walked into a trestle where he was struck by a car coming from the opposite direction. The case turned on the fact whether he was warned not to go on the trestle by the conductor. If he was so warned, he was guilty of contributory negligence. The court held that on plaintiff's showing the question of contributory negligence was for the jury and there was no error in the trial court's refusal to direct a non suit. In the *Carter* case plaintiff had purchased a ticket to a station and boarded a through train which did not stop at her destination. She declined to get off at an intermediate station and take the next train to her destination as advised by the conductor, but got off at another station intending to go to her sister's home two miles distant to stay at night, and walk back to her destination about nine miles the next day. The sister not being at home, plaintiff continued her journey on foot over a rough mountain road on a hot day, to her destination, resulting in sickness. The court said she was without necessity to take the long walk under the circumstances, and it was her duty to minimize her damages by getting off at the stop designated by the conductor and proceed by the local train following. In the *Fowlks* case plaintiff purchased a ticket and boarded the train upon information that it made a close connection with another train which would carry her to her ultimate destination. The information was wrong, and upon arriving at the junction she found that she would be obliged to wait until the next day for the other train. She hired a buggy and set out in the face of a storm, in delicate health, and over a rough road a distance of eight miles to her father's house. A miscarriage resulted. The court (Virginia) held that it could

not be reasonably anticipated that plaintiff would, upon fail-ing to make quick connection at the junction, hire a buggy and undertake to continue her journey in the face of a storm, over a rough road in her delicate condition to her father's house; holding to the rule adopted in some jurisdictions that a person guilty of a negligent act should be held responsible for all the consequences which a prudent person fully ac-quainted with all the circumstances, which in fact existed, would, at the time of the act have thought reasonably pos-sible to follow, if they had occurred to his mind. In *Lewis v. Flint*, the passenger, upon being carried past his destina-tion, knew where he was after alighting from the car, and travelled a route on which there was a cattle guard and which he knew was there and was expecting to cross it. He could have travelled a safer route, but relied upon his knowledge of the location of the cattle guard. The night was dark and his vision was dimmed by a lambent light from a near by lime kiln. In attempting to cross the cattle guard his foot caught and he fell in. It was held that defendant's negli-gence was not the proximate cause. A pure accident broke the sequence. A somewhat similar case is *Haley* v. *St. Louis Transit Co.*, 77 S. W. 731. Many cases could be cited and re-viewed where the decision turned upon some peculiar fact or circumstance, and which would shed but little light on the case before us. Each case must be viewed and decided upon its own facts. It has been held that where a passenger voluntarily and needlessly walks back instead of waiting for a returning train, the company is not liable for injuries sustained by him from his exposure on his way back, the damages not being the proximate result of the company's breach of duty. *Natchez &c. R. R. Co.* v. *Lambert*, 99 Miss. 310; *Garland* v. *Carolina & C. Ry. Co.*, 172 N. C. 638; *Le Beau* v. *Minneapolis &c. Ry. Co.*, 164 Wis. 30; L. R. A. 1917 A. 1017. Nellis on Street Railways Vol. 2, Sec. 326, says: "The decided weight of authority is to the effect that, one who is carried beyond his destination, or stopped short of it, and is directed by the conductor to alight, and being ignor-ant of the surroundings and dangers that might befall him, while attempting to get to his station with or without the di-

rections of the person in charge of the car, receives injuries while exercising ordinary care for his own safety, the company is responsible to him in damages.'' Space forbids reference to the many decisions which embody the principle found in the above quotation. See *Yazoo & Miss. Valley R. R. Co.* v. *Hardie* 64 So. 1, reported in 4 N. C. C. A. 664 and monographic notes. Some of the decisions hold the carrier liable for damages to passenger on the walk back, where he has been put off after being carried by his destination, on the theory that a person placed in such a position would be most likely to walk back if no other convenient way was left open to him, and that an injury suffered in doing so was a natural sequence to the carrier's negligence, and the proximate cause of the injury. *Georgia &c. Ry. Co.* v. *McAllister,* 126 Ga. 447; 7 L. R. A. (N. S.) 1177 and note.

The difficulty in the instant case is in determining whether the independent acts of plaintiff after leaving the car caused her injury, and whether such acts were those of a prudent and reasonable person under similar circumstances. Was the injury caused by her negligence and did it result proximately therefrom? She was advised by the motorman to get off at Handley. He says she did so voluntarily. In considering the case, his evidence being in conflict with her evidence on that particular point must be discarded. But both say that he told her to await the eastbound car which would be along in about fifteen minutes. The two women, not seeing the small structure erected for waiting passengers, stood in darkness and rain, frightened, and in a strange place. How long they waited does not appear. They say they waited a ''long time'', and it was getting late in the night. Thinking the eastbound car might have been delayed by wreck or some unknown cause, they thought best to walk back home. They did not know the location or direction of the near by roads which were safer routes. That they were confused and frightened in the intense darkness is evidenced by the fact that they passed East Road, which crossed the track and extended past the block where plaintiff lived and was the most direct and easy route to her home from East Road Stop; and went on up the track a hundred yards or so where

they suddenly walked into the trestle. She says there were houses discernible where she got off, but they were not lighted. A man would likely have been bold enough to have aroused the occupants and made inquiry. A timid woman would not likely do so. What character of person might she meet in so doing? What advantage would an unscrupulous stranger take of their then helpless situation? What would timid females imagine? What would they do? The circumstances tend to corroborate plaintiff in her statement that they waited for the eastbound car, for they walked about one-half mile, suffered the fall and were taken by a westbound car back past Handley to the town of Ceredo, where she was transferred to the same eastbound car for which she was directed to wait. Under all these circumstances can we say as a conclusion of law that it was prudent for her to stand in the darkness, cold and rain until the car came; that it was a safe place for her to stay indefinitely; that she was imprudent and without reasonable regard for her safety in attempting to walk back on the tracks to her home? On the other hand, it is reasonable to presume that any timid woman would have done as she did. The general rule as to what is the proximate cause of an injury is ordinarily a jury question. It is not a question of science or legal knowledge. Generally, "It is to be determined as a fact, in view of the circumstances of fact attending it." *M. & St. P. Ry. Co.* v. *Kellogg*, 94 U. S. 474. See also 29 Cyc. 639 and citations from the decisions of various states. Under all the evidence and circumstances we are reluctant to say as a conclusion of law that the attempt of plaintiff to reach her home by walking the track in the darkness was contributory negligence on her part and prevents a recovery for her injuries. The judgment and verdict will not be disturbed.

*Affirmed.*